# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### (NORTHERN DIVISION)

UNITED STATES OF AMERICA,       :
ex rel. GARY YUROW, M.D.

        **Plaintiff,**                :

v.                              :    Civil Action No.

ST. JOSEPH MEDICAL CENTER       :    **FILED UNDER SEAL**
                     :    **Pursuant to 31 U.S.C. 3729** *et.seq.*

and                             :

CATHOLIC HEALTH INITIATIVES     :

        **Defendants**              :

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff and *qui tam* relator, Gary Yurow, M.D., through his attorneys, Jamie M. Bennett, Esq. and Nathan M. Peak, Esq., for his Complaint against St. Joseph Medical Center ("SJMC") and Catholic Health Initiatives ("CHI") alleges as follows:

## INTRODUCTION

1. This is an action to recover statutory damages and civil penalties under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, on behalf of the United States of America. Plaintiff/ Relator seeks to recover damages and civil penalties arising from false or fraudulent claims that Defendant submitted or caused to be submitted to the Medicare and Medicaid programs for services that were the product of illegal remuneration and prohibited financial relationships. These false or fraudulent claims were part of a scheme to induce physicians to refer patients to SJMC in violation of the Stark Statute, 42 U.S.C. § 1395nn, and the Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b).

LAW OFFICES
SHCRAFT & GEREL, LLP
SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX 301-881-6132

SUITE 301
METRO 400 BUILDING
1300 GARDEN CITY DRIVE
LANDOVER, MD 30785

301-459-8400
FAX 301-459-1364

SUITE 1212
EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX 410-547-1261

LAW OFFICES
SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-2730
FAX 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX 301-459-1364

SUITE 1212
1 EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1123
FAX 410-547-1261

## JURISDICTION

2.  This action arises under the False Claims Act, as amended, 31 U.S.C. §§ 3729-3733, and at common law.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 & 1331, and its general equity jurisdiction.

## VENUE

3.  Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732(a) as the place where the claims arose.  Personal jurisdiction is proper over the Defendants as they have a principal place of business and/or have committed acts in violation of the FCA in this District.

## THE PARTIES

4.  Plaintiff/Relator Gary Yurow, M.D. is a board certified cardiologist who has practiced medicine in and around the Baltimore, Maryland area for eleven years.  From 2001 until August 1, 2011, he was employed by MidAtlantic Cardiovascular Associates ("MidAtlantic").  He practiced at the MidAtlantic Pikesville office and Sinai Hospital until the fall of 2005, when he added St. Joseph Medical Center and office to his coverage area.  He became a partner in MidAtlantic in January 2006. From August 1, 2011 until the present, he has been employed by Chesapeake Cardiovascular Associates, a wholly owned affiliate of MedStar Health.

5.  Defendant St. Joseph Medical Center is a 460 bed acute care hospital located in Towson, Maryland.  SJMC is one of five hospitals in the Baltimore metropolitan area that has a Certificate of Need ("CON") issued by the State of Maryland.  The CON allows SJMC to perform open heart surgery, including coronary artery bypass, grafts, and valve replacement surgery.  SJMC also has a cardiac catheterization laboratory and performs diagnostic cardiac catheterizations and balloon angioplasty (percutaneous coronary intervention; PCI), among other

invasive cardiology procedures. SJMC was, at all times relevant to the allegations of this Complaint, a wholly owned subsidiary of Catholic Health Initiatives. On December 1, 2012, SJMC merged with the University of Maryland Medical Center, to become the University of Maryland St Joseph Medical Center. Upon information and belief, Catholic Health Initiatives, the parent company for SJMC retained the liabilities of SJMC in the merger.

6. Defendant Catholic Health Initiatives is a faith-based Colorado non profit health care organization, head-quartered in Denver, Colorado. CHI operates health care facilities in 19 states, including Maryland.

## BACKGROUND

## THE LAW

### A. The False Claims Act

7. The False Claims Act provides that any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval, or who knowingly makes, uses or causes to be made or used, a false record or statement material to a false or fraudulent claim to the Government is liable for damages in the amount of three (3) times the amount of loss the Government sustained, and penalties ranging between $5,500 and $11,000 per claim. 31 U.S.C. § 3729(a); 28 C.F.R. § 85.3. For purposes of the FCA, "the terms 'knowing' and 'knowingly' mean that a person, . . . (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b). "[N]o proof of specific intent to defraud is required" for liability under the FCA. *Id.*

LAW OFFICES
SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX 301-881-6137

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX 301-459-1364

SUITE 1212
10 EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX 410-547-1261

**B.     The Anti-Kickback Statute**

8.  The federal Anti-Kickback Statute ("AKS") prohibits the payment, in any form, whether direct or indirect, made in part or in whole to induce or reward the referral or generation of federal health care business.  The AKS prohibits the offer or payment of "anything of value" in return for referrals.  A "thing of value" is defined broadly to include payment in cash or kind. The AKS extends equally to the solicitation or acceptance of payments, to offers to pay, and to actual payments for referrals.  Under the AKS both criminal and civil penalties apply, civil monetary penalties apply, and exclusion from federal health benefit programs is possible.  The AKS was enacted because of Congressional concerns that payments made in return for referrals would lead to overutilization, affect medical judgment, and restrict competition, ultimately resulting in poor quality of care being delivered to patients.

9.  In addition to prohibiting payments designed to induce referrals, the AKS prohibits the entity receiving a tainted referral from presenting or causing to be presented to Medicare any claim for referrals that are induced by kickbacks. In 2010 the AKS was amended to specifically provide that a claim that includes items or services resulting from kickback violations are deemed "false" under the FCA. 42 U.S.C. § 1320a-7b(g).

10.  The AKS has statutory and regulatory "Safe Harbors" that identify specific arrangements that do not violate the statute if the parties comply with all of the terms of the Safe Harbor.  For example, the "personal services" Safe Harbor permits compensation arrangements between non-employee physicians and hospitals if: (1) there is a written agreement between the parties that is signed by the physician and the institution; (2) the term of the agreement is at least one year; (3) the agreement covers all of the services to be provided by the physician and sets forth his or her duties with specificity; (4) the aggregate compensation paid to the consultant

LAW OFFICES
SHCRAFT a GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX. 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301 770-3737
FAX 301-881-6132

SUITE 301
METRO 400 BUILDING
3811 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX 301 459-1264

SUITE 1212
EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX 410-547-1261

over the term of the agreement is set in advance, is consistent with Fair Market Value in an arms-length transaction, and is not determined by the volume or value of any referrals or business otherwise generated between the physician and the hospital. 42 C.F.R. § 1001.952(d).

## C.     The Stark Statute

11.  The Stark Statute prohibits a physician from referring Medicare patients for certain "designated health services" ("DHS") to an entity with which he has a "financial relationship," unless an exception applies. 42 U.S.C. § 1395nn(a)(1)(A). The purpose of the statute is to reduce excess costs incurred by the Medicare program due to overutilization of services, anti-competitive behavior, and the corruption of medical judgment to advance physicians' financial self-interests.

12.  The Stark Statute defines DHS to include inpatient and outpatient hospital services. *Id.* § 1395nn(h)(6). The statute broadly defines "financial relationship" to include physician compensation arrangements, as well as ownership and investment interests. *Id.* § 1395nn(a)(2). The Stark Statute applies to both direct and indirect financial relationships. 42 C.F.R. § 411.354.

13.  In addition to prohibiting certain physician referrals, the Stark Statute prohibits an entity receiving a referral from a person or entity with which it has a financial relationsip from presenting or causing to be presented to Medicare any claim for DHS provided as a result of that referral. 42 U.S.C. § 1395nn(a)(1)(B). The statute prohibits a physician or other person from presenting or causing to be presented a claim for DHS that the physician knows or should know is for an item or service that is not payable under the statute. *Id.* § 1395nn(g)(3).

14. As with the AKS, Stark is subject to "Safe Harbor" exceptions that identify specific arrangements that will not violate the statute as long as all terms of the exceptions are observed. For example, under Stark, a compensation arrangement between a physician and a hospital is

LAW OFFICES
SHCRAFT & GEREL, LLP
SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036
———
202-783-6400
FAX 202-416-6392
———
SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311
———
703-931-5500
FAX 703-820-9630
———
SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKILLE, MD 20852
———
301-770-3737
FAX 301-881-6132
———
SUITE 301
METRO 400 BUILDING
1301 GARDEN CITY DRIVE
LANDOVER, MD 20785
———
301-459-8400
FAX 301-459-1364
———
SUITE 1212
EAST BALTIMORE STREET
BALTIMORE, MD 21202
———
410-539-1122
FAX 410-547-1261

exempt if: (1) the arrangement is set out in writing, signed by the parties, and specifies the services covered by the arrangement; (2) the arrangement covers all the services to be provided by the physician; (3) the aggregate services contracted for do not exceed those that are reasonable and necessary for the legitimate business purposes of the arrangements; (4) the term of the arrangement is at least one year; and (5) compensation under the arrangement is set in advance, does not exceed fair market value and does not take into account the volume or value of any referrals.

## D.   THE MEDICARE AND MEDICAID PROGRAMS

15.   In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services furnished to eligible individuals over the age of 65. See 42 U.S.C. §§ 1395-1395hhh. Part A of the Medicare Program authorizes payment for covered institutional care, including hospital, skilled nursing facility and home health care. See 42 U.S.C. §§ 1395c-1395i-4. Part B of the Medicare Program authorizes payment for, among other things, outpatient hospital services. 42 U.S.C. §§ 1395k(a), 1395l(t).

16.   In order to participate in Medicare, hospitals must enter into provider agreements with HHS under which HHS reimburses them for providing covered services to eligible Medicare beneficiaries. Medicare generally pays a provider for inpatient and outpatient hospital services under one of the prospective payment systems applicable to such services. The prospective payment amounts reflect the costs of treating individual patients, including certain operating and administrative expenses.

17.   The Medicare Provider Agreement that SJMC entered into states, as relevant here:

LAW OFFICES
SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8200
FAX 301-459-1354

SUITE 1212
1 EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX 410-547-1261

"I agree to abide by the Medicare laws, regulations and program instructions that apply [to me]....I understand that payment of a claim by Medicare is *conditioned* upon the claim and the underlying transaction complying with such laws, regulations and program instructions (*including but not limited to, the Federal Anti-Kickback Statute and the Stark Law*) and on the provider's compliance with all applicable conditions of participation" *See* Form CMS-855A (emphasis added).

18.   Upon discharge of Medicare beneficiaries from a hospital, the hospital submits claims for reimbursement for items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. § 412.116.  At all times relevant to this Complaint, SJMC submitted patient-specific claims on a Form UB-92.

19.   Hospitals must submit a Form CMS-2552, more commonly known as the hospital cost report, to CMS annually.  Cost reports are the final claim that a provider submits for items and services rendered to Medicare beneficiaries. 42 C.F.R. § 412.52.

20.   During the relevant time period, final Medicare payment for hospital services was determined in part by the claims submitted during the course of the fiscal year by the provider for particular patient discharges as listed on UB-92s and later captured on the Medicare cost report.

21.   Under the rules applicable at all times relevant to this Complaint, Medicare, through its fiscal intermediaries, had the right to audit the hospital cost reports and financial representations made by SJMC to ensure their accuracy and to preserve the integrity of the Medicare Trust Funds.  This right includes the right to make retroactive adjustments to hospital cost reports previously submitted by a provider if any overpayments have been made.

LAW OFFICES
SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX 703-820-0630

SUITE 1202
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX 301-681-6132

SUITE 301
METRO 400 BUILDING
1301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX 301-459-1364

SUITE 1212
1 EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-530-1122
FAX 410-547-1261

22. SJMC was, at all times relevant to this Complaint, required to submit an annual hospital cost report to Medicare. Every hospital cost report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

23. At all times relevant to this Complaint, the hospital cost report certification page included the following notice:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil, and administrative action, fines and/or imprisonment may result.

24. At all times relevant to this Complaint, the responsible provider official was required to certify, in pertinent part:

> to the best of my knowledge and belief, it [the hospital cost report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted.
>
> I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

25. Thus, the provider was required to certify that the filed hospital's cost report is (1) truthful, *i.e.*, that the cost information contained in the report is true and accurate; (2) correct, *i.e.*, that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) complete, *i.e.*, that the hospital cost report is based upon all information known to the provider; and (4) that the services provided in the cost report were billed in compliance with applicable laws, including the Anti-Kickback Statute and the Stark Statute.

LAW OFFICES
SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W
WASHINGTON, D.C. 20036

202-783-6400
FAX 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301 770-3737
FAX 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX 301-459-1264

SUITE 1212
1 EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX 410-547-1261

26. A hospital is required to disclose all known errors and omissions in its claims for Medicare reimbursement (including its cost reports). Section 1320a-7b(a)(3)of the Social Security Act specifically creates a duty to disclose known errors in cost reports:

> Whoever...having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment...conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized...shall in the case of such a ...concealment or failure...be guilty of a felony.

27. SJMC submitted cost reports, with the signed certification quoted above, at all times material to this Complaint. By violating the Anti-Kickback Statute and the Stark Statute in the manner described below, Defendants knowingly caused the certification quoted above to be falsely submitted.

28. Medicaid is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled. The federal Medicaid statute sets forth the minimum requirements for state Medicaid programs to qualify for federal funding, which is called federal financial participation (FFP). 42 U.S.C. §§ 1396 et seq.

29. Each state's Medicaid program must cover hospital services. 42 U.S.C. § 1396a(10)(A), 42 U.S.C. § 1396d(a)(1)-(2).

30. In Maryland, hospitals participating in the Medicaid program submit claims on the UB-92 form for hospital services rendered to Medicaid recipients to the Maryland Department of Health and Mental Hygiene. The UB-92 includes the following certification in connection with Medicaid claims: "This is to certify that the foregoing information is true, accurate, and complete. I understand that payment and satisfaction of this claim will be from Federal and State

LAW OFFICES
SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W
WASHINGTON, D.C. 20036

202-783-6400
FAX 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX 301-881-6132

SUITE 301
METRO 400 BUILDING
2201 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX 301-458-1564

SUITE 1212
EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX 410-547-1261

funds, and that any false claims, statements, or documents, or concealments of a material fact, may be prosecuted under applicable Federal and State Laws."

31.  By violating the Anti-Kickback Statute in the manner described below, Defendants caused the submission of false claims to the Maryland Medicaid program.

## FACTS

32.  As noted, SJMC is an acute care hospital located in Towson, Maryland.  SJMC is one of five hospitals in the Baltimore metropolitan area (along with Sinai Hospital, University of Maryland Medical Center, Johns Hopkins Medical Center and Union Memorial Hospital, which is owned by MedStar Health) that have been granted a Certificate of Need ("CON") to perform open heart surgery and interventional cardiology (percutaneous revascularization, *i.e.*, angioplasties and stents of coronary arteries.  SJMC's financial health has historically been dependent, to a large extent, on its cardiology line of business.

33.  Over the years, most of the referrals of cardiac procedures to SJMC have come from independent cardiologists or cardiology group practices in the greater Baltimore metropolitan area.  Similarly, independent cardiologists and cardiology practices also relied upon referrals from SJMC.  Patients who present to the SJMC Emergency Room ("ER") who were in need of cardiology evaluation and/or invasive cardiac procedures, and who did not have an existing relationship with a cardiologist, were referred to a cardiologist by the ER physicians.  SJMC maintains a "call schedule," to let ER physicians know which cardiologist is available on any given night or weekend to take emergency cases.  Until mid-2008, that call schedule was arrived at through negotiation among area cardiologists, and the number of nights or weekends a cardiology practice was assigned calls generally was commensurate with each group's proportion of actively practicing cardiologists at SJMC.

LAW OFFICES
SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX  202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX  703-820-0690

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX  301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX  301-459-1364

SUITE 1212
1 EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX  410-547-1261

34.  In 2008, SJMC began to aggressively recruit cardiologists, including cardiologists employed by MidAtlantic, to join SJMC's staff.  In January, 2008, SJMC hired Mark Midei, M.D. a MidAtlantic interventional cardiologist with the ability to refer millions of dollars worth of procedures to SJMC each year.  SJMC also hired Stephen Pollock, M.D. a MidAtlantic general cardiologist.  Dr. Pollock had a large patient base, which gave him the ability to refer millions of dollars of business to SJMC.  SJMC hired four more cardiologists in the spring of 2008, Ronald Schechter, James Ricely, Sidney Gottlieb, and Mahmood Alikahn.

35.  MidAtlantic continued as an independent cardiology practice up until August 1, 2011, when it dissolved as a medical practice, continuing in business only to collect accounts receivable and maintain an electronic medical record system that its former physicians in practice in the Baltimore area continue to utilize.  After MidAtlantic's dissolution, groups of MidAtlantic doctors were hired by various Baltimore area medical systems.  As relevant here, some of the cardiologists, including Dr. Yurow, who had previously worked in MidAtlantic's Pikesville and Towson offices, along with a number of former MidAtlantic cardiologists at other locations, were hired by MedStar Health.  Their employment agreement with MedStar permits them to continue to see and treat patients at SJMC and other non MedStar hospitals.  That group is called Chesapeake Cardiovascular.

36.  In the spring of 2008, after SJMC hired Drs. Midei and Pollock, SJMC decided to restrict MidAtlantic physicians' ability to obtain referrals from SJMC's emergency room by curtailing, and in the case of interventional cases, entirely eliminating MidAtlantic doctors from the SJMC Emergency Room ("ER") call schedules described above.  (The one exception to this general rule occurred by necessity around April, 2009 when Dr. Midei was placed on administrative leave and later suspended from practice by the Defendant based upon allegations

LAW OFFICES
SHCRAFT & GEREL, LLP
SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX: 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-2737
FAX 301-881-5102

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX 301-459-1364

SUITE 1212
9 EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX 410-547-1261

that he had performed medically unnecessary procedures. At that time, Midatlantic interventional cardiologists were temporarily placed back in the interventional call schedule, until the hospital hired replacements for Dr. Midei.) As part of that plan, SJMC increased its efforts to hire cardiologists who would be able to care for patients who had previously been referred to MidAtlantic from the SJMC ER.

37. Dr. Pollock, who was the Chief of Cardiology at SJMC, told Dr. Yurow about a conversation that took place during a meeting at SJMC in February of 2008. John Tolmie, then CEO of SJMC, told the attendees that he had decided MidAtlantic would no longer receive any referrals from SJMC. At the same time, Mr. Tolmie and Sylvia Moore, SJMC's COO, decided that MidAtlantic would be greatly restricted in terms of billing for the interpretation of cardiac graphics -- echocardiology, stress tests, EKGs and Holters -- that were performed at SJMC. Instead, the preponderance of tests would be read and billed for by hospital employed cardiologists and two private cardiologists, Michael Pressel, M.D. and Douglas Clark, M.D., or physicians who staffed the SJMC ER, as explained in more detail below. Previously, MidAtlantic had been assigned seventy percent of the slots on the graphic reading schedule, a figure that reflected the group's substantial presence as practicing cardiologists at SJMC compared to other groups.

38. As noted above, like most hospitals, SJMC maintains call schedules to insure coverage by medical specialties when a patient comes to the hospital through the emergency department at night or on weekends. The cardiac call schedule sets forth which doctors would be called on particular dates if a patient presented at the hospital with cardiac complaints and/or needed interventional cardiac procedures. If the patient does not have an existing relationship with a cardiologist, then the cardiologist who was on call would likely acquire that patient -- the

LAW OFFICES
SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C 20036

202-783-6400
FAX. 202-416-6362

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX 301-881-5132

SUITE 301
METRO 400 BUILDING
4201 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-499-8400
FAX 301-429-1364

SUITE 1212
1 EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX 410-547-1261

referral -- from the call schedule.  For that reason, the ability to obtain "call" duties can be critical to medical specialists in finding new business and growing or maintaining their practice.

39.  At SJMC, there are separate ER call schedules, one for general cardiology and one for interventional cardiology.  SJMC also maintains ER call schedules for other medical specialties, including general surgery and orthopedics.

40.  Before SJMC hired Drs. Pollock and Midei, MidAtlantic, which comprised about 70% of the physicians actively practicing at SJMC, had at least 70% of the call schedule, meaning that they were on call 20 to 25 nights and weekends per month.  After SJMC hired Drs. Pollock, Midei, and other cardiologists, MidAtlantic found its physicians gradually restricted to one night's call per week on the general cardiology call schedule, although the number of MidAtlantic cardiologists had stayed fairly constant.  This meant that although MidAtlantic continued to employ approximately 60-70% of the cardiologists actively practicing at SJMC, it was assigned only about 15% of the ER call schedules.  In addition, two private solo cardiologists each had as much call as the whole of MidAtlantic.  This substantially affected the flow of new patients to MidAtlantic, resulting in a significant loss of new business and revenue to MidAtlantic.  MidAtlantic was largely replaced on the call schedule by physicians whom SJMC employed, along with two private cardiologists not affiliated with Midatlantic.

41.  In order to enforce its decision to limit MidAtlantic's calls and to limit the number of referrals that MidAtlantic would obtain from SJMC, SJMC exerted significant pressure on physicians who staffed the SJMC Emergency Room, to refer cardiology cases to SJMC employed cardiologists.  It is the ER doctors who make the decision about which patients were "unassigned", *i.e.* who did not have an existing relationship with a cardiologist, and those doctors refer those unassigned patients to other cardiologists.

LAW OFFICES
SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX: 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX: 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX: 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX: 301-459-1364

SUITE 1212
1 EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1123
FAX: 410-547-1261

42. The physicians who staff the SJMC ER are part of the Osler Drive Emergency Physicians Associates ("ODEPA"). ODEPA is an independent physicians association, not directly or indirectly employed by SJMC. Gail Cunningham, M.D., has been the President of ODEPA and also served as the Chief of Emergency Medicine at SJMC under a medical director agreement with SJMC during the period of time at issue. She was also President of the medical staff for two years. Dr. Cunningham recently assumed the post of Chief Medical Officer at SJMC. ODEPA has the exclusive right to staff the SJMC ER and has done so for approximately fifteen years.

43. According to two employed physicians with whom Dr. Yurow has discussed this issue, ODEPA does not have a written contract with SJMC. ODEPA and SJMC operate under a verbal agreement that allows ODEPA to exclusively staff the SJMC ER, separately billing patients and health insurers for its physicians' professional services. Under this verbal agreement, ODEPA is also permitted, as of the fall of 2008, to read and bill for, the interpretion of EKGs performed on patients presenting to the SJMC ER, an unusual arrangement in this region. SJMC bills separately for hospital services, including claims for the facility and technical component of ER visits. SJMC provides space and equipment to ODEPA, and also provides support personnel to staff the ER, free of charge to ODEPA.

44. Since mid-2008, SJMC has made it clear to ODEPA physicians that they are required, as a condition of continuing to have the right to staff the SJMC ER, to refer all new cardiac patients -- that is, all unassigned patients -- to physicians who are on the SJMC mandated call schedule. For the most part, physicians on the SJMC call schedule are SJMC employed cardiologists and interventionalists. ODEPA physicians understand that they must use the call list for unassigned cardiology cases even if they prefer to work with other cardiologists,

LAW OFFICES
SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N W
WASHINGTON, D.C. 20036

202-783-6400
FAX  202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX  703-820-0630

SUITE 1102
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX  301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX  301-459-1364

SUITE 1212
1 EAST BALTIMORE STREET
BALTIMORE, MD 21202

410 539 1122
FAX  410-547-1261

such as MidAtlantic cardiologists. Dr. Yurow has been told that most of the emergency department physicians would prefer to use Midatlantic physicians if they have a choice. According to Dr. Pollock, who until January 12, 2012 served as Chief of Cardiology of the SJMC Heart Center, if ODEPA physicians did not comply with the hospital mandated call schedule regarding cardiology referrals, "they would be fired",losing the right to staff the SJMC ER.

45. By definition, all of ODEPA's patients come from SJMC through its emergency room. ODEPA does not have a practice that is independent of the SJMC ER. ODEPA does not provide care at any other hospital in the Baltimore area, and all other area hospitals are staffed by hospital employed physicians or independent contractors. Effectively, if SJMC decided not to allow ODEPA to continue to provide care at the SJMC ER, ODEPA would likely cease to do business as a separate entity. Its physician employees would be forced to find work at other area hospitals, or leave the Baltimore area.

46. As noted, the Plaintiff/Relator is a general cardiologist who was previously employed by MidAtlantic. Since the summer of 2008, when SJMC first began to limit call and eventually eliminate call for MidAtlantic cardiologists, Dr. Yurow voiced his concerns about this issue within the business and medical leadership at SJMC. Dr. Yurow has discussed SJMC's decision to limit MidAtlantic's assignment on the SJMC ER call schedules with persons in leadership roles within SJMC and CHI. Dr. Yurow has, through his investigation, learned the following additional facts about the Defendants' decision to eliminate MidAtlantic cardiologists from call.

47. Dr. Yurow discussed the ER call schedule with Stephen Pollock, one of the former MidAtlantic physicians who was hired by SJMC in February 2008. Dr. Pollock served as Chief

LAW OFFICES
SHCRAFT & GEREL, LLP
SUITE 400
2000 L STREET, N W
WASHINGTON, D.C. 20036

202-783-6400
FAX. 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX 301-459-1364

SUITE 1212
0 EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX 410-547-1261

of Cardiology at SJMC from approximately 2002 until January 2012. Dr. Pollock told Dr. Yurow that after he was hired by SJMC in 2008, SJMC decided to curtail MidAtlantic's ability to get referrals from the SJMC ER by curtailing their participation in the ER call schedule. Dr. Pollock told Dr. Yurow that he changed the call schedule in response to explicit instructions from John Tolmie, then SJMC CEO, and Sylvia Moore, then the SJMC COO. Dr. Pollock personally drafted the new call schedule that largely eliminated MidAtlantic physicians from call. The purpose of this change was specifically to limit the number of referrals to MidAtlantic. As SJMC increased the number of hospital employed cardiologists over the course of the summer of 2008, MidAtlantic's presence on the call schedule was drastically reduced. After some MidAtlantic physicians were hired by MedStar Health in August, 2011, SJMC issued another new ER call schedule completely eliminating former MidAtlantic cardiologists from ER call.

48. According to ODEPA physicians, SJMC enforces the cardiology call schedules much more stringently than call schedules for other specialties, such as general surgery. ODEPA physicians feel free to, and often do, refer patients outside the prescribed call schedule to general surgeons or orthopedists they prefer because of those physicians' superior quality or responsiveness.

49. Dr. Yurow also discussed the call schedule with Dr. Hardesty, Chief of the Department of Medicine for SJMC in the spring 2011 when Dr. Yurow and his colleagues at MidAtlantic were in employment negotiations with MedStar. Dr. Yurow asked Dr. Hardesty if SJMC would consider giving him and his partners equal access to the SJMC ER schedule if the Towson contingent of MidAtlantic remained an independent professional association instead of becoming part of MedStar Health. Dr. Hardesty responded by saying that he would investigate

LAW OFFICES
SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX 202-416-6392

SUITE 850
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX 703-820-0630

SUITE 1102
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX 301-861-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX 301-459-1264

SUITE 1212
1 EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX 410-547-1261

the issue and provide a response to Dr. Yurow. Two weeks later he called to say he did not know if the Midatlantic doctors would get any additional call assignments. This would depend, according to Dr. Hardesty, on making sure that new cardiologists SJMC might hire were kept busy enough. The implication is that the call schedule was designed to support SJMC employed cardiologists through referrals from the ER, and that this goal took precedence over any other considerations.

50. SJMC changed its leadership structure in February, 2009 in reaction to a federal investigation by the Office of the Inspector General of the U.S. Department of Health and Human Services. John Tolmie and Sylvia Moore were dismissed. Beth O'Brien, Senior Vice President for CHI, functioned as acting head of the hospital until october 2009. On October 22, 2009, Jeffrey Norman was named president and CEO of SJMC on November 9, 2009, reporting to Ms. O'Brien. Dr. Yurow had three meetings with Mr. Norman beginning in early 2010 regarding the ER call schedule. Mr. Norman was initially sympathetic, but took no action to resolve the issue. Dr. Yurow met with him and others (including Frank Morris, Mike Pressel and another SJMC administrator) in late fall 2010 to let Mr. Norman know that he had the signatures in place to call a special meeting of the Cardiology Department under SJMC's By-Laws to address the issue of ER call. At that meeting, Mr. Norman reacted with hostility and anger. Dr. Yurow also discussed the ER call schedule with Dr. Cunningham when she was President of the medical staff, specifically about his wishes to call a special meeting to address the issue.

51. In a face-to-face meeting that took place in September or October, 2011, Dr. Yurow discussed his concerns about the ER call schedule with Charles Neumann, then President and CEO of SJMC. Dr. Yurow asked Mr. Neumann if SJMC would re-open the ER call schedule to former MidAtlantic doctors. Dr. Yurow raised the issue, during this meeting, of whether the

LAW OFFICES
SHCRAFT & GEREL. LLP

SUITE 400
2000 L STREET, N.W
WASHINGTON, D.C 20036

202-783-5400
FAX 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX 703-820-0630

SUITE 1102
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX 301-881-6132

SUITE 301
METRO 400 BUILDING
4201 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX 3111-459-1364

SUITE 1212
1 EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX 410-547-1261

existing call schedule was compliant with SJMC's Corporate Integrity Agreement[1].  Mr. Neumann responded that he thought it was a completely legal arrangement.

52.  Two weeks later, when Dr. Yurow followed up on the concerns he had raised with Mr. Neumann in their face-to-face meeting, Mr. Neumann asked Jesus Cepero, the then Director of the SJMC Heart Institute, to respond to Dr. Yurow on his behalf.  Mr. Neumann told Dr. Yurow that he was too preoccupied with efforts to sell the financially troubled SJMC to another institution to personally follow up with Dr. Yurow.

53.  On November 14, 2011, Dr. Yurow spoke about the ER call schedule with Mr. Cepero.  Dr. Yurow asked Mr. Cepero to investigate the call schedule and determine whether changes could be made that would make the schedule more inclusive of MidAtlantic.  Mr. Cepero responded to Dr. Yurow's inquiry by saying that SJMC was going to continue to instruct ODEPA physicians to send unassigned patients to SJMC employed physicians as a "straight forward business decision," based upon the administration's discussion of this issue at a recent meeting Mr. Cepero had attended.  Dr. Yurow understood this to mean that the Defendant needed to secure referrals from the ER to keep its employed cardiologists busy.  Dr. Yurow again expressed his belief that the call schedule was not compliant with the CIA that SJMC had entered into in 2011.  Mr. Cepero responded by saying he was unaware of the CIA.

54.  SJMC's decision to require ODEPA to send unassigned cardiac patients to the physician listed on the call schedule, which was/is generally a SJMC employed physician conflicts with the values that both the AKS and Stark law are designed to protect.  As of the summer of 2008 all interventional patients were sent to SJMC employed physicians regardless of

LAW OFFICES
SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036
—
202-783-6400
FAX 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, IA 22311
—
703-931-5500
FAX 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852
—
301-770-3737
FAX 301-881-6132

SUITE 301
METRO 400 BUILDING
4201 GARDEN CITY DRIVE
LANDOVER, MD 21785
—
301-459-8400
FAX 301-459-1364

SUITE 1212
1 EAST BALTIMORE STREET
BALTIMORE, MD 21202
—
410-539-1123
FAX 410-547-1261

---

[1]   On November 9, 2011, SJMC entered into a Settlement Agreement with the U.S. Department of Justice and a Corporate Integrity Agreement with the U.S. Department of Health and Human Services resolving allegations that it had entered into remuneration agreements with MidAtlantic that violated the AKS, by paying compensation in excess of Fair Market Value.

their level of experience.  For example, one of the newly hired SJMC interventionalists was placed into the interventional call rotation, in place of more experienced MidAtlantic interventionalists, just weeks after completing training, with little or no supervision from more experienced interventionalists.

55.  A review of SJMC ER call schedules reveals the chronology of changes set forth above.  In March, 2008 before the changes mandated by John Tolmie and Sylvia Moore, MidAtlantic doctors were on call at SJMC 23 out of 31 days.  By August, 2009, MidAtlantic was on call 3 days out of 31.  By October, 2011, MidAtlantic has been completely eliminated from the ER general cardiology call roster.

56.  ODEPA has a financial relationship with SJMC as that term is defined under the Stark Law and the AKS as ODEPA has the exclusive right to staff the SJMC ER and SJMC provides ODEPA staff and facilities free of charge.  ODEPA also has a financial relationship with SJMC as that term is defined under the Stark Law and the AKS as SJMC has granted it the exclusive right to read, and bill for the interpretaton of EKGs at SJMC.  42 U.S.C. § 1395nn(h)(1)(B).  Because SJMC and ODEPA appear to have no written contract, this financial relationship cannot fall within any of the prescribed safe harbors as a matter of law.

57.  Even if there were a written contract between SJMC and ODEPA, SJMC has violated the AKS in its relationship with ODEPA by offering and paying remuneration to ODEPA -- that is the right to staff the SJMC ER and the right to read, and to bill for the interpretation reading of EKGs -- in return for the referral of cardiac patients to SJMC and to its employed physicians.  Because one of the purposes of the remuneration relationship is to induce referrals to the Defendant, the relationship violates the AKS.

LAW OFFICES
SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N W
WASHINGTON, D.C 20036

202-783-6400
FAX 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX 301-459 1364

SUITE 1212
1 EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539 1122
FAX 410-547-1261

19

## COUNT I
### False Claims Act, 31 U.S.C. § 3729 (a)(1)
### Presenting Claims to Medicare and Medicaid
### for Services Rendered as a Result of Illegal Financial Relationships

58. Plaintiff incorporates by reference paragraphs 1 - 57 of this Complaint as if fully set forth.

59. Defendants knowingly caused to be presented, false and fraudulent claims for payment or approval to the United States, including claims for reimbursement for services rendered to patients unlawfully referred to Provider in violation of the Stark Statute and the AKS. The claims were false and fraudulent because:

a. they were ineligible for reimbursement under the Stark Statute's express prohibitions on Medicare billing and Medicare reimbursement for services that are the product of a prohibited referral from Defendants, with whom Provider had a financial relationship; and/or

b. payment of the claims was conditioned on cost report certifications that were false.

60. By virtue of the false or fraudulent claims caused to be made by Defendants, the United States suffered damages and therefore is entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT II
### False Claims Act, 31 U.S.C. § 3729(a)(2)
### Use of False Statements

61. Plaintiff incorporates by reference paragraphs 1 - 57 of this Complaint as if fully set forth.

62. Defendants knowingly caused to be made or used, false records or statements – i.e., the false certifications and representations submitted by SJMC in seeking reimbursement for services rendered to Federal health care program beneficiaries – to get false or fraudulent claims paid and approved by the United States.

LAW OFFICES
SHCRAFT & GEREL, LLP
SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX 703-820-0630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX 301-881-6132

SUITE 301
METRO 400 BUILDING
1901 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX 301-459-1964

SUITE 1212
EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX 410-547-1261

63. By virtue of the false or fraudulent claims caused to be made by Defendants, the United States suffered damages and therefore it entitled to multiple damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## COUNT III
### False Claims Act, 31 U.S.C. § 3729(a)(7)
### False Record to Avoid an Obligation to Refund

64. Plaintiff incorporates by reference paragraphs 1 - 57   of this Complaint as if fully set forth.

65. Defendants knowingly caused to be made or used false records or false statements – i.e., the false certifications and representations submitted by SJMC in seeking reimbursement or services rendered to Federal health care program beneficiaries – to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

66. By virtue of the false records or false statements caused to be made by Defendants, the United States suffered damages and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each violation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff United States of America demands that judgment be entered in its favor and against the defendants as follows:

A. On Count I (Presenting or Causing Presentment of False Claims), judgment against the Defendant for treble damages as further established at trial plus a penalty of $11,000 per false claim as established at trial; and

B. On Count II (Knowingly Presenting A False Or Fraudulent Record), judgment against the Defendant for treble damages as further established at trial plus a penalty of $11,000 per false claim as established at trial; and

LAW OFFICES
SHCRAFT & GEREL, LLP
SUITE 400
2000 L STREET, N W
WASHINGTON, D.C. 20036

202-783-6400
FAX 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX 703-820-0620

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX 301-881-6132

SUITE 301
METRO 400 BUILDING
301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301-459-8400
FAX 301-459-1364

SUITE 1212
EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX 410-547-1261

C.  On Count III (False Record to Avoid An Obligation to Refund), judgment against the Defendant for treble damages as further established at trial plus a penalty of $11,000 per false claim as established at trial.

Respectfully submitted,

BY:

Nathan M. Peak (MD Bar #17061)
Jamie M. Bennett, Esq.
Ashcraft & Gerel, LLP
4301 Garden City Drive
Suite 301
Landover, MD  20785

## PRAYER FOR JURY TRIAL

The United States of America and Relator prays a jury trial in this action.

LAW OFFICES
SHCRAFT & GEREL, LLP

SUITE 400
2000 L STREET, N.W.
WASHINGTON, D.C. 20036

202-783-6400
FAX. 202-416-6392

SUITE 650
4900 SEMINARY ROAD
ALEXANDRIA, VA 22311

703-931-5500
FAX 703-820-5630

SUITE 1002
ONE CENTRAL PLAZA
11300 ROCKVILLE PIKE
ROCKVILLE, MD 20852

301-770-3737
FAX 301-881-6132

SUITE 301
METRO 400 BUILDING
4301 GARDEN CITY DRIVE
LANDOVER, MD 20785

301 459-8400
FAX 301-459-1364

SUITE 1212
EAST BALTIMORE STREET
BALTIMORE, MD 21202

410-539-1122
FAX 410-547-1261